**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 17-cv-01912-CMA-NRN

AMOIKON FRANCOIS-XAVIER N'GOUAN,

     Plaintiff,

v.

AB CAR RENTAL SERVICES, INC.,

     Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
_____

     This matter is before the Court on Defendant AB Car Rental Services, Inc.'s

Motion for Summary Judgment. (Doc. # 45). The Court has reviewed the Motion,

Plaintiff's Response (Doc. # 50), Defendant's Reply (Doc. # 52), and Plaintiff's "2nd

Response," which the Court treats as a Sur-Reply[1] (Doc. # 54). The Court also notes

that Magistrate Judge Neureiter held a hearing on November 1, 2018, during which the

court heard arguments by the parties on Defendant's Motion. After considering the

parties' arguments, the entire case file, and the applicable law, Defendant's Motion for

---

[1] Although filing surreplies is not contemplated by the Fed. R. Civ. Pro., and typically is not allowed without leave of court, which Plaintiff did not seek, because Plaintiff is proceeding pro se, the Court may afford him more leniency and has, therefore, considered his sur-reply in ruling on Defendant's Motion for Summary Judgment.

Summary Judgment (Doc. # 45) is granted in part and denied in part for the reasons set forth below.

## I.     PLAINTIFF'S CLAIMS & DEFENDANT'S SUMMARY JUDGMENT MOTION

This is an employment discrimination case brought by pro se Plaintiff Amoikon François-Xavier N'Gouan ("Mr. N'Gouan" or "Plaintiff")[2] against his former employer, Defendant AB Car Rental Services Inc. ("Defendant"), pursuant to Title VII and the Americans with Disabilities Act. Mr. N'Gouan alleges that Defendant failed to accommodate his disability, and also failed to promote and then fired him based on his race, national origin, and/or disability. Mr. N'Gouan also asserts that his termination was in retaliation for complaints he filed with management about his requested disability accommodations and his unsatisfactory work environment, which included being teased by co-workers for exercising his rights under the Family Medical Leave Act ("FMLA").

Defendant has moved for summary judgment on all of Mr. N'Gouan's claims. Defendant argues it reasonably accommodated each of Mr. N'Gouan's requests concerning his disability (Doc. # 45 at 9–10); that Mr. N'Gouan has no direct evidence that his termination was discriminatory, i.e. that it was based on either his race, national origin, or disability (*id.* at 11–13); and that it had a legitimate reason for terminating Mr.

---

[2] The Court must construe the filings of a pro se litigant liberally. *See Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citations omitted). The Court may not, however, be the pro se litigant's advocate, nor should the Court "supply additional factual allegations to round out [the pro se litigant's] complaint or construct a legal theory on [his or her] behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (citing *Hall*, 935 F.2d at 1110).

N'Gouan (*id.* at 13). Additionally, Defendant argues Mr. N'Gouan cannot show that its legitimate reason for terminating Mr. N'Gouan is a pretext for discrimination.

## II. BACKGROUND

Mr. N'Gouan began working for Defendant on July 15, 2013, as a Rental Service Agent ("RSA") at its Kansas City Airport location. (Doc. # 45-1 at 3–4; Doc. # 50-1 at 131.) When Mr. N'Gouan began working for Defendant, he agreed to comply with Defendant's Work Rules, which set forth examples of unacceptable behaviors, including, "[b]eing rude, abusive or threatening to customers or co-workers." (Doc. # 45-1 at 50–51.) On August 11, 2014, Mr. N'Gouan transferred to Defendant's Denver International Airport ("DIA") location. (*Id.* at 6; Doc. # 50-1 at 131.)

A.    <u>Plaintiff's Disability and Requested Accommodations</u>

In the fall of 2013, Mr. N'Gouan was diagnosed with end stage renal failure, and he began having dialysis treatments three times a week. (Doc. # 45-1 at 5.) Mr. N'Gouan does not dispute that Defendant made the following accommodations as a result of his diagnosis and treatment plan:

1. providing intermittent leave under the FMLA, which allowed Mr. N'Gouan to take off up to three days per week for dialysis treatment (*id.* at 52–53);

2. providing a chair based on an October 30, 2014 Accommodation Request Form ("ARF") signed by Mr. N'Gouan's health care provider, which stated that

Mr. N'Gouan could not stand for prolonged periods of time and needed to sit in a chair while working[3] (*id.* at 10–11, 53–6);

3. allowing Mr. N'Gouan to leave work by 11:00 p.m. whenever he asked to do so based on a March 19, 2015 letter signed by his health care provider, which stated that "[i]n order to accommodate [Mr. N'Gouan's] medical needs, a work schedule between the hours of 11:00 am and 11:00 pm is recommended" (*id.* at 57); and

4. honoring an April 6, 2015 ARF[4] signed by Mr. N'Gouan's health care provider—which supplemented the March 19 letter—and specifically stated that Mr. N'Gouan's "dialysis treatment may interfere with [his] ability to work any shift or any day," and therefore he "cannot work late after 11:00 pm the day before and on the day of dialysis," and he "needs an off day on Tue[sday] or Thurs[day] or Sat[urday]," as well as a "shift between 11:00 am and 11:00 pm." (*id.* at 57, 60-62).

Rather, Mr. N'Gouan's ADA discrimination claim is based entirely on Defendant's failure to allow him to work a day shift. Defendant's DIA location uses a shift bidding system in which employees periodically bid for different shift assignments based on their seniority. (*Id.* at 114.) Mr. N'Gouan's first bid while employed at Defendant's DIA

---

[3] The October 30, 2014 ARF—the first one submitted by Mr. N'Gouan to Defendant's DIA location—did not ask for any type of accommodation for Mr. N'Gouan's work hours. (*Id.* at 53–6.)

[4] The April 6, 2015 ARF also confirmed that Mr. N'Gouan's dialysis appointments were for 5:00 a.m. to 9:00 a.m. on Tuesday, Thursday, and Saturday. (*Id.* at 61.)

location was for the 5:00 p.m. to 1:00 a.m. shift, and Mr. N'Gouan was assigned to the shift on which he placed his bid. (*Id.* at 16, 114.) While Mr. N'Gouan was working the night shift, he had dialysis treatments from 5:00 a.m. to 9:00 a.m. on Tuesday, Thursday, and Saturday. (*Id.* at 7–9, 57, 60.)

Beginning in November 2014, Mr. N'Gouan decided that he would prefer to have his dialysis treatments at night after work. (*Id.* at 73; Doc. # 50 at 1.) Therefore, Mr. N'Gouan asked Defendant to allow him to work during the day, rather than at night. However, he never submitted a doctor's letter or ARF signed by his health care provider specifically indicating that, for health reasons, Mr. N'Gouan had to work a day shift. Further complicating matters was that, at the time he made this request, there were no night time dialysis appointments available either at the clinic where Mr. N'Gouan received his treatments or at other clinics where he inquired. (Doc. # 50 at 1.) Although Defendant ultimately denied Mr. N'Gouan's request to move to a day shift, it advised Mr. N'Gouan in an email dated March 27, 2015, that there would be another shift bid at the end of May 2015, for shifts beginning June 2015, at which time he would have more seniority and a better chance of getting his desired shift. (Doc. # 45-1 at 58–59.)

On September 12, 2016, Mr. N'Gouan sent a statement to his manager complaining about a number of issues. Among his complaints were not getting an accommodation for his medical condition, being "blamed" by co-workers for taking FMLA leave, working overtime, and having to deal with a customer who put his hand on Plaintiff. (Doc. # 50-1 at 9.) In the statement, Mr. N'Gouan indicated: "[i]f I can't get a

resolution for this coming bid shift, I will find any legal options I have under the medical disabilities act to get justice." (*Id.*)

B.  Mr. N'Gouan's Issues with Co-Workers, Allegations of Discrimination

On January 16, 2015, Mr. N'Gouan's co-worker, Kirk Gilles, submitted a written complaint stating he was uncomfortable working with Mr. N'Gouan because, among other things, Mr. N'Gouan had put his hands on Mr. Gilles on two occasions. (Doc. # 45-1 at 70.) Despite Mr. Gilles' request to Mr. N'Gouan that he not touch him again, Mr. N'Gouan subsequently touched Mr. Gilles three more times. (*Id.*) In response, Mr. N'Gouan submitted a statement that indicated he had never picked on Mr. Gilles, but would stay away from him. (*Id.* at 71–72.) On February 15, 2015, Mr. N'Gouan submitted a written complaint stating that when he had called the preferred office to ask for a premium car, Mr. Gilles hung up on him, and that this was not the first time Mr. Gilles had acted in a hostile manner towards him. (*Id.* at 76–77.)

On May 18, 2015, Mr. N'Gouan sent an email to two of Defendant's managers complaining about his work environment, and, more specifically, about several incidents involving Mr. Gilles allegedly getting mad and yelling at him, including calling him a "pain in the ass." (*Id.* at 79.) According to Mr. N'Gouan, Mr. Gilles and other co-workers also jokingly called him "Mister FMLA," saying nothing was wrong with him, accusing him of lying about his condition and playing the system, and asking why he took FMLA leave and parked in the handicap spot. (Doc. # 50 at 6, 10; Doc. # 1 at 4; Doc. # 45-1 at 37–38.)

6

Additionally, in his Complaint, Mr. N'Gouan alleges that when he would ask to go home early or called in sick, one of Defendant's managers, Evi Pichler, would say things like "Again?", "you don't look sick," "I thought you African people were hard worker [sic]." (Doc. # 1 at 4.) Ms. Pichler allegedly called him "Mister FMLA" a few times. (*Id.*) Mr. N'Gouan also alleges in his Complaint that in October 2016, Mr. Gilles asked him if he would go back to Africa "[w]hen Trump become[s] president." (Doc. # 1 at 9.)

    C.   <u>Customer Incidents Involving Mr. N'Gouan</u>

On or about June 30, 2015, an unidentified customer filled out a customer survey stating that Mr. N'Gouan "was rude; hard to understand; and did not answer questions in a helpful or accurate manner." (Doc. # 45-1 at 80–81.) There is nothing in the record indicating Mr. N'Gouan was disciplined, spoken to, or received a written warning as a result of this customer survey.

According to Defendant, on August 29, 2016, when Mr. N'Gouan was asked by his manager to go from the Preferred Service Desk to the counters to help with the line, he yelled at the manager. He was told his behavior was not acceptable. (Doc. # 50-1 at 121.) Defendant also alleges that in August of 2016, Mr. N'Gouan yelled at a Preferred Service customer. When spoken to about the incident, Mr. N'Gouan's response was that "the customer was stupid and needs to pay his bill." (*Id.* at 121.) Defendant acknowledges that Mr. N'Gouan "received no formal discipline" for these two incidents but asserts Mr. N'Gouan was "counseled by management at the time." (*Id.* at 134.) However, there is no written record of any such counseling and Mr. N'Gouan asserts that there is nothing in the record indicating he was disciplined, spoken to, or received a

written warning concerning either of the alleged August 2016 incidents. (Doc. # 50 at 16.) During his deposition, Defendant's District Manager, Justin Nolan, testified that he does not remember who in management counseled Mr. N'Gouan in relation to the two incidents that occurred in August 2016. (Doc. # 50-1 at 208.) Mr. Nolan also could not remember the name of the customer involved in the August 2016 incident, and he does not know which manager heard Mr. N'Gouan say the customer had been stupid. (*Id.* at 209.)

It is undisputed that Plaintiff never had any form of documented suspension regarding his behavior, nor any documented incident with a manager, nor any documented incident with a customer. (Doc. # 50-1 at 192; Doc. # 50 at 16).

D.    The November 6, 2016 Customer Incident and Mr. N'Gouan's Termination

On November 6, 2016, Mr. N'Gouan was involved in a dispute with one of Defendant's national account customers. (Doc. # 1 at 11; Doc. # 45-1 at 27; Doc. # 50 at 11; Doc # 50-1 at 132.) Two of Mr. N'Gouan's co-employees witnessed the incident and provided statements to Defendant regarding their perception of what happened. The statements were provided to Mr. N'Gouan the next day. (Doc. # 50 at 12.)

One of the employees, Binyam Hailu, "stated that he heard Plaintiff tell the customer that he was the 'dumbass that signed the contract' and to 'get the fuck out.'" When Mr. Hailu "asked Plaintiff why he cursed at the customer, [] Plaintiff responded that 'He cursed at me so I cursed at him.'" (Doc. # 45 ¶ 22; Doc. # 45-1 at 45, 88–89.) The other employee, Sergio Reyes, stated he "heard the customer yelling and Plaintiff

telling him that he was done listening to him and he needed to leave the building." (Doc. # 45 ¶ 22; Doc. # 45-1 at 90–91.)

The same evening, Manager Evi Pichler separately spoke with both the customer involved in the incident and Mr. N'Gouan. She sent an email to Jon Prachyl, Defendant's district manager, and Manager Justin Nolan regarding these conversations. (Doc. # 45-1 at 94.) According to Ms. Pichler, the customer told her Plaintiff was rude, had called him stupid, and told him "to get the f… out." (*Id.*; Doc. # 45 ¶ 23.) Ms. Pichler also advised that the customer "will send me a statement." (Doc. # 45-1 at 94.) However, there is no record of any statement ever being provided by the customer. At Defendant's 30(b)(6) deposition, its representative (Mr. Nolan) stated Defendant did not follow up with the customer, and had no way to contact him. (Doc. # 50-1 at 193–94.)

Mr. N'Gouan does not dispute that he got in to an argument with a customer on November 6, 2016. He also does not dispute that, when he spoke with Ms. Pichler about the incident, he raised his voice with her, accused her of taking sides with customers, and refused to apologize to her for his behavior. (Doc. # 45-1 at 27–30, 106.) However, Mr. N'Gouan denies yelling at Ms. Pichler or swearing at Mr. Johnson. (*Id.*)

On November 7, 2016, Mr. N'Gouan met with Jon Prachyl, Defendant's district manager, and Matt Smith, Defendant's DIA manager, to discuss the November 6, 2016 incident. (Doc. # 45-1 at 31, 101–04; Doc. # 50-1 at 133.) At the end of the meeting, Mr. Prachyl instructed Mr. N'Gouan to write a statement and go home as he was suspended pending further investigation. (Doc. # 50-1 at 133.) On November 7, 2016, Mr. N'Gouan

sent an email to Defendant regarding the November 6, 2016 incident with the customer, in which he stated that the customer cursed at and was rude to him. He also included a statement about a separate incident a few months earlier in which a different "racist customer" had called him "son of [b]itch." (Doc. #45-1 at 108–111.)

Ultimately, on November 29, 2016, Defendant sent a letter to Mr. N'Gouan terminating his employment due to a "pattern of unacceptable behavior" in "violation of the company work rule" prohibiting employees from "[b]eing rude, abusive or threatening to customers or co-workers." (Doc. # 45-1 at 112.) The letter described the two August 2016 incidents and indicated that the November 6, 2016 incident was the "third time" Mr. N'Gouan had been involved "very egregious" incidents with customers and management. (*Id.*) However, Defendant concedes there are no written records of the August 2016 incidents.

E.  Customer/Manager Incidents Involving White Employees

Mr. N'Gouan contends that a similarly situated white employee, Todd Miller, had similar incidents with customers but was never terminated for such conduct. Mr. Miller worked for Defendant from March 2008 through May 2016. (Doc. # 45-1 at 113.)

A December 30, 2014 "Final Warning – Work Rules Violation," addressed to Mr. Miller confirms that: "on December 11th, 2014, an incident occurred between you and the manager on duty. During the exchange, you used foul language and became visibly upset all while in customer view. Please be advised that your actions are a violation of company work rules, specifically: Being rude, abusive or threatening to customer or co-workers. Please note that any further infraction of this nature will result in further

disciplinary action, up to termination." (Doc. # 50-1 at 231.) According to Mr. Miller's

affidavit, Defendant did not terminate him, despite the fact that he allegedly used the "F"

word in front of a customer and manager and violated company rules by being rude,

abusive, or threatening to a customer or co-worker. (*Id.* at 230; Doc. # 54 at 5.)

      F.    <u>Mr. N'Gouan 's Application for a Promotion</u>

Mr. N'Gouan further asserts that he was discriminated against due to a failure to

promote. In support of this claim, he alleges that in the summer of 2016, two white

customer service representatives ("CSRs") were promoted to operations managers. He

asserts that he filled out an application for a manager's position sometime in September

2016 and handed the application to either Manager Justin Nolan or Manager Evi

Pichler. (Doc. # 45-1 at 17–18.) However, Mr. N'Gouan did not retain a copy of the

application. (*Id.* at 18.) According to Mr. N'Gouan, when he spoke with Mr. Nolan

regarding his application, Mr. Nolan advised that he did not think Mr. N'Gouan was

suitable for an operations management position because of his medical condition. (*Id.* at

20.)

### III.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment serves the purpose of testing whether a trial is

required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court

shall grant summary judgment if the pleadings, depositions, answers to interrogatories,

admissions, or affidavits show there is no genuine issue of material fact, and the moving

party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if

it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial burden of providing the court with the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Courts may only consider admissible evidence when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must

be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, i.e., the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005). Additionally, because Mr. N'Gouan is proceeding pro se, the Court will liberally construe his filings. *Haines*, 404 U.S. at 520-21.

## IV.    ANALYSIS

A.  <u>Defendant did not Unreasonably Fail to Accommodate Plaintiff's Disability</u>

To establish a prima facie case of failure to accommodate under the Americans with Disabilities Act ("ADA"), a plaintiff has the burden of proving that (1) he is a qualified individual with a disability, (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate the disability. *Allen v. SouthCrest Hosp.*, 455 F. App'x 827, 830 n.2 (10th Cir. 2011).

Mr. N'Gouan satisfies the first two elements, but his claim fails on the third. Mr. N'Gouan does not dispute that every time Mr. N'Gouan presented Defendant with a request for accommodation from his health care provider, Defendant granted the request and provided Mr. N'Gouan with precisely what the accommodation asked for.

Further, Mr. N'Gouan does not dispute that he did not, at any time during his employment with Defendant, present Defendant with an AFR or letter from his health care provider stating he needed to be accommodated by working during the day shift so

he could have his dialysis treatments in the early evening. *See*, *e.g.*, *Reyes v. Krasdale Foods, Inc.*, 945 F. Supp. 2d 486 (S.D.N.Y. 2013) (employer reasonably accommodated plaintiff by providing accommodations requested in doctor's letter, which only addressed plaintiff's working hours and not changing her schedule, and plaintiff did not provide any evidence of doctor request for schedule modification); *Heatherly v. Portillo's Hot Dogs Inc.*, 958 F. Supp. 2d 913 (N.D. Ill. 2013) (employer did not violate ADA by denying employee's request to only work inside, which was her preference, where her doctor's note did not prohibit her from working outside).

The fact that Mr. N'Gouan *preferred* to have his dialysis treatments at night, rather than the early morning, and then to work a day shift was not a sufficient basis to require Defendant to move Mr. N'Gouan's to a day shift position.[5]  In order to hold Defendant liable for failure to provide an accommodation due to his disability, Mr. N'Gouan was required to provide Defendant with a letter or AFR signed by a health care provider saying an earlier shift was required due to his disability.[6] Therefore, summary judgment is warranted on Plaintiff's failure to accommodate claim.

---

[5] Moreover, Mr. N'Gouan admits that the treatment center he went to did not have any early evening spots available for his dialysis treatment—nor did other treatment facilities with which he inquired.

[6] Mr. N'Gouan's assertion that his current employer, CarMax, did allow him to work a daytime shift, and thus accommodated his personal preference and request to work during the day is irrelevant. Furthermore, Mr. N'Gouan concedes that it was not until *after* Defendant terminated him that an open spot for his dialysis treatments became available at the clinic, which, in turn, prompted him to seek an accommodation to his work schedule.

B. <u>Claim for Discriminatory Termination</u>

Mr. N'Gouan claims that his termination by Defendant was unlawful because it was based on his race, national origin, and disability. "Title VII makes it unlawful 'to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (quoting 42 U.S.C. § 2000e–2(a)(1)). Moreover, the ADA provides that it is unlawful to discriminate against an individual based on that individual's disability. *See, e.g.*, *Morgan v. Hilti, Inc.*,108 F.3d 1319, 1323 (10th Cir. 1997). Where, as here, a plaintiff has no direct evidence that his termination was discriminatory, the plaintiff's claims are subject to the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden shifting framework.

1. *Mr. N'Gouan's discrimination claim based on his race*

To establish discriminatory dismissal based on race or national origin under Title VII, a plaintiff must show: he is a member of a protected class; he was discharged; he was qualified for the position at issue; and he was treated less favorably than others not in the protected class. *Khalik*, 671 F.3d at 1192. Further, "[e]vidence of an employer's more favorable treatment of employees who are not members of a plaintiff's protected class can provide an inference of discrimination if the employees are similarly 'situated.'" (Doc. # 45 at 12); *Swackhammer*, 493 F.3d at 1167–1168. "Individuals are considered 'similarly-situated' when they: (1) have dealt with the same supervisor; (2) were subjected to the same work standards; and (3) had engaged in the same conduct

without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *MacKenzie v. City & County of Denver*, 414 F. 3d 1266, 1277 (10th Cir. 2005), *abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018).

Defendant argues that "Plaintiff's *prima facie* case fails because no evidence exists to show that he and [Mr.] Miller were 'similarly situated,'" and that "the evidence shows that differentiating and mitigating circumstance easily explain the difference in how Defendant chose to discipline them." (Doc. # 45 at 12–13.) Defendant asserts Mr. Miller did not yell at his manager, yet the actual write-up concerning Mr. Miller involved an incident with "the manager on duty," during which Mr. Miller "used foul language and became visibly upset all while in customer view."

The Court finds that Mr. N'Gouan satisfies each of the elements for discriminatory termination due to race under Title VII: he is a member of a protected class, he was discharged, he was qualified for the position at issue, and he was treated less favorably than Mr. Miller, who is a white employee.

The Court disagrees with Defendant's argument that Mr. Miller and Mr. N'Gouan could not be viewed as similarly situated.[7] Mr. Miller's conduct violated the same company rule that Defendant relied on to terminate Mr. N'Gouan, which prohibits

---

[7] The Court does, however, agree with Defendant that Plaintiff's allegation that he and Mr. Gilles were treated differently by Defendant when they each filed complaints against each other is not a basis for any of Plaintiff's discrimination claims because Plaintiff's termination was not based on the conflict between them and their differences in treatment (if any) were not substantial. (Doc. # 52 at 7.)

employees from "[b]eing rude, abusive or threatening to customer or co-workers."

Although Mr. Miller's write-up does not specifically say Mr. Miller actually *yelled* at the

manager, his behavior nonetheless was extreme, as he "us[ed] foul language" with the

manager in front of a customer. In addition, Mr. N'Gouan disputes that he yelled at

either the customer or his manager[8] and Mr. N'Gouan also disputes the allegation that

he cursed at the customer. Rather, Mr. N'Gouan argues that he has a loud voice and

that it was the customer who cursed at him.

Therefore, the Court finds that a reasonable fact finder could find that Mr.

N'Gouan has established a prima facie case of discriminatory termination based on his

race. Accordingly, the burden shifts to Defendant to articulate a legitimate

nondiscriminatory reason for the termination of Mr. N'Gouan's employment. *McDonnell*

*Douglas*, 411 U.S. at 802. To meet this burden, Defendant need only offer an

explanation to rebut the presumption raised by Mr. N'Gouan's prima facie case. *St.*

*Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

Defendant asserts it had such a nondiscriminatory reason because Mr. N'Gouan

had violated its work rules by being rude and unprofessional both to customers and also

to a manager. According to Defendant, in one incident, Mr. N'Gouan cursed at the

customer, using the "F" word, and then yelled at his manager when she attempted to

counsel him regarding the situation. Thus, Defendant has adequately articulated a

legitimate, nondiscriminatory reason for Mr. N'Gouan's termination.

---

[8] Defendant, in its Reply brief, asserts that "nowhere in his Response does Plaintiff deny that he
. . . yelled at his supervisor when counseled about this incident." However, the evidence
presented by Mr. N'Gouan reflects his repeated denial of this alleged fact. (Doc. # 52 at 4.)

This does not, however, end the analysis. If Mr. N'Gouan can demonstrate that Defendant's legitimate nondiscriminatory reason is merely pretext for its discriminatory conduct, then summary judgment in Defendant's favor is improper. *McDonnell Douglas*, 411 U.S. at 804. Mr. N'Gouan can make this showing if he identifies evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that *a reasonable factfinder* could rationally find them unworthy of credence." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (emphasis added).

Defendant admits that the November 6, 2016 incident between Mr. N'Gouan, the customer, and Mr. N'Gouan's manager Ms. Pichler, was the *first time* Mr. N'Gouan had been written up in relation to a customer or manager complaint. Although in its termination letter, and letter to the EEOC, Defendant points to two other alleged incidents that occurred in August 2016, it concedes Mr. N'Gouan was not written up for either of these incidents. Additionally, Defendant's Rule 30(b)(6) representative could not provide any salient details concerning these other incidents, such as the names of the customer or manager involved.

The Court finds that a reasonable fact finder could reasonably find that there are sufficient "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in" Defendant's proffered legitimate reasons for terminating Mr. N'Gouan, thus, rendering them "unworthy of credence." *Swackhammer*, 493 F.3d at 1167.

Accordingly, the Court finds that Mr. N'Gouan has provided sufficient evidence to create a triable issue of fact regarding his claim for discriminatory termination. As a

result, Defendant's motion for summary judgment is denied as to Plaintiff's race-based discriminatory termination claim.

### 2. Mr. N'Gouan's discrimination claim based on his disability

To establish discriminatory dismissal based on a disability under the ADA, a plaintiff must show: (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) he was terminated under circumstances that give rise to an inference that the termination was based on his disability. *Morgan*,108 F.3d at 1323.

With respect to Mr. N'Gouan's claim that his termination was motivated by his disability, the Court agrees with Defendant that Mr. N'Gouan has presented no evidence indicating he "was terminated under circumstances that give rise to an inference that the termination was based on his disability." *Id*. Defendant provided reasonable accommodations to Mr. N'Gouan by complying with every request made by his health care providers. Additionally, there is no indication in the record that any of the events leading up to Mr. N'Gouan's termination had anything to do either with the fact of his disability, or any of his personal requests for accommodation. Accordingly, Defendant's motion for summary judgment seeking dismissal of Mr. N'Gouan's claim for wrongful termination based on his disability is granted.

### C. Failure to Promote Claim

Mr. N'Gouan contends that Defendant discriminated against him under both Title VII and the ADA because it failed to promote him to a management position. A plaintiff alleging a failure-to-promote claim under Title VII must establish a prima facie case

demonstrating that: (1) he belongs to a protected class, (2) he applied and was qualified for a job for which Defendant was seeking applicants, (3) Defendant rejected his application, and (4) after his rejection, the position remained open and Defendant continued to seek applicants from persons of Plaintiff's qualifications, or Defendant filled the position. *Pathak v. Fedex Trade Networks T & B Inc.*, 329 F. Supp. 3d 1263 (D. Colo. 2018). To establish a prima facie failure-to-promote claim under the ADA, a plaintiff must show: (1) he has a "disability" within the meaning of the ADA; (2) he was qualified, with or without reasonable accommodation, to perform the essential job functions of the position he sought; and (3) his employer refused the promotion under circumstances giving rise to an inference that the decision was based on his disability. *Rakity v. Dillon Cos., Inc.*, 302 F.3d 1152, 1164 (10th Cir. 2002) (citation omitted).

The primary problem with Mr. N'Gouan's failure-to-promote claim is that there is no evidence that a manager position was even available at the time he allegedly submitted an application in September 2016. Furthermore, there is no evidence that Defendant promoted another RSA to a manager position at Denver's DIA location during the time Defendant employed Mr. N'Gouan. Although Mr. N'Gouan alleges that two CSRs[9] were promoted to management positions during the summer of 2016, Mr. N'Gouan has not alleged, nor has he presented any evidence, that he had applied for those management positions.

---

[9] CSRs differ from RSAs in that they check cars in when a customer returns them, whereas RSAs check cars out when customers originally rent them. (Doc. # 45-1 at 19.)

Mr. N'Gouan has presented insufficient evidence that Defendant refused to promote him to a manager position "under circumstances giving rise to an inference that the decision was based on his disability." *Rakity*, 302 F.3d at 1164. Therefore, the Court grants summary judgment in favor of Defendant on Mr. N'Guan's failure to promote claim.

D. Retaliation Claim

Mr. N'Gouan alleges "[t]he retaliation started when I called the HR manager, Pamela, to complaint [sic] about the fact that my accommodation was denied by Justin in early 2015," and he "was warned by Mrs. Pichler that I should have not call HR on Justin and she implied that it will not be good." (Doc. # 50 at 9.) Mr. N'Gouan also alleges his co-employees teased him about taking FMLA leave, prompting his co-employees, as well as his manager Ms. Pichler, to call him "Mr. FMLA." (Doc. # 50 at 9– 10).[10] Mr. N'Gouan's retaliation claim appears to be two-fold: Defendant retaliated against him, presumably by firing him at the end of November 2016, because (1) in or around "early 2015," he complained to Human Resources, about not getting an accommodation he requested (specifically, to work a day rather than night shift); and (2)

---

[10] In his Response brief, Mr. N'Gouan appears to take issue with Defendant's policies concerning the use of accrued paid leave versus unpaid FMLA leave (Doc. # 50 at 10–11), and also alleges that, "as a retaliation," he "was forced to work more than 8h/day on multiple occasions." (*id.* at 11.) However, these allegations are not set forth, articulated, or even raised by inference in his Complaint (*see* Doc. # 1). It also appears that Mr. N'Gouan is attempting to assert an FMLA claim premised on interference with his right to take FMLA leave. However, not only has he presented no evidence that he was ever denied a request to take, or prevented from taking, leave guaranteed by the FMLA, but also, Mr. N'Gouan admits he was never denied the right to use his FMLA leave. *Dalpiaz v. Carbon County, Utah*, 760 F.3d 1126, 1132 (10th Cir. 2014). As such, the court declines to address these new FMLA allegations.

in May 2016, he complained about his work environment and employees who teased him for taking FMLA leave.

Under Title VII, it is unlawful for an employer to retaliate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). A plaintiff can establish retaliation either directly, by showing that retaliation played a motivating part in the employment decision, or indirectly, by relying on the three-part *McDonnell Douglas* framework. *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987 (10th Cir. 2011). To state a prima facie case for retaliation under Title VII, a plaintiff must show: (1) he engaged in protected opposition to discrimination, (2) he suffered a materially adverse employment action, and (3) a causal connection exists between the protected opposition/activity and the materially adverse employment action. *Pathak*, 2018 WL 3053292, *14.

Retaliation claims under the FMLA are also subject to *McDonnell Douglas*'s burden shifting analysis. To establish a prima facie case of retaliation under the FMLA, a plaintiff must show: (1) he engaged in protected activity, (2) the employer took a materially adverse action, and (3) there was a causal connection between elements one and two. *Id.* In evaluating retaliation claims, the concept of temporal proximity comes in to play, and requires a plaintiff to show his termination either was "*very closely connected in time to the protected activity*," or provide "additional evidence beyond temporal proximity to establish causation." *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1184 (10th Cir. 2002) (emphasis in original).

Although Mr. N'Gouan may be able to establish the first two elements of his retaliation claim, he has not presented sufficient evidence of any causal connection between his protected activities and his termination. Mr. N'Gouan's complaints to management and his termination at the end of November 2016 are simply too attenuated, not to mention too remote in time, for any inference of causation. Therefore, Defendant's motion for summary judgment on Mr. N'Gouan's retaliation claims is granted.

E.  Hostile Work Environment Claim

Mr. N'Gouan asserts that comments by his co-workers, i.e., calling him "Mr. FMLA," and asking him whether he would return to Africa when Trump became president created a hostile work environment. "For a hostile environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *MacKenzie*, 414 F.3d at 1280 (quoting *Penry v. Fed. Home Loan of Topeka*, 155 F.3d 1257, 1261 (10th Cir.1998)).

> "To evaluate whether a working environment is sufficiently hostile or abusive, we examine all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance."

*Id*. (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Additionally, "the environment must be both subjectively and objectively hostile or abusive." *Id*. Moreover, "[t]he Supreme Court has instructed that courts judging hostility should filter out

complaints attacking the ordinary tribulations of the workplace, such as sporadic use of age-related jokes, and occasional teasing." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1988)).

In the instant case, as in *MacKenzie*, Mr. N'Gouan's allegations "fall short of demonstrating pervasive or severe harassment." *Id.* Mr. N'Gouan himself refers to the allegations regarding calling him "Mr. FMLA" as a joke that he felt went too far. Although he and his co-worker, Mr. Gilles, had on-going issues allegedly involving negative statements—e.g., concerning Mr. N'Gouan taking FMLA leave, and also asking him whether he would return to Africa when Trump became president—these statements alone do not suffice to create the requisite abusive work environment. Isolated or ambiguous comments, or "stray remarks," are not material in showing that an employer's actions were based on discrimination. *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) (finding isolated age-related comments made by personnel who were and were not involved in an employee's termination were insufficient to show age discrimination); *see also Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1265 (7th Cir.1993) (supervisor's occasional comments that the Korean-American employee should "learn to speak English" were insufficient to show discrimination).

The Court finds that Mr. N'Gouan has presented insufficient evidence to support a hostile work environment claim. Therefore, Defendant's motion for summary judgment on Plaintiff's hostile work environment claim is granted.

## V. CONCLUSION

Based on the foregoing, the Court ORDERS that Defendant AB Car Rental Services, Inc.'s Motion for Summary Judgment (Doc. # 45) is GRANTED IN PART and DENIED IN PART as follows:

1. Defendant's Motion for Summary Judgment is DENIED with respect to Plaintiff Mr. N'Gouan's claim for discrimination based on race;

2. Defendant's Motion for Summary Judgment is GRANTED in relation to all of Plaintiff's remaining claims.

Trial in this matter will be limited to Mr. N'Gouan's clam for discrimination based on race.

DATE: November 26, 2018

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge