**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 17-cv-01912-CMA-NRN

AMOIKON FRANCOIS-XAVIER N'GOUAN,

      Plaintiff,

v.

AB CAR RENTAL SERVICES, INC.,

      Defendant.

_____

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
_____

      On August 8, 2017, Plaintiff Amoikon Francois-Xavier N'Gouan, acting *pro se*, initiated the instant action against his former employer, Defendant AB Car Rental Services, Inc. (Doc. # 1.) Subsequently, on November 11, 2018, this Court granted Defendant's Motion for Summary Judgment (Doc. # 45) in relation to all of Plaintiff's claims except for his claim of discriminatory termination based on his race pursuant to Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e *et seq.* ("Title VII"). Accordingly, this Court held a two-day bench trial from December 4–5, 2018.

      Plaintiff testified on his own behalf and called three other witnesses, all of whom were current or former employees of Defendant. Defendant cross-examined Plaintiff's witnesses and called four additional witnesses. Both parties introduced, and adduced testimony about, numerous documentary exhibits. After closing arguments, the Court took the matter under advisement.

After reviewing the evidence submitted at trial and the entire record including Plaintiff's Trial Brief (Doc. # 69), which Plaintiff submitted after trial, the Court makes the following findings of fact and conclusions of law pursuant to the Court's obligations under Federal Rule of Civil Procedure 52(a).

## I. <u>FINDINGS OF FACT</u>[1]

Plaintiff is an African American male who is originally from the Ivory Coast in West Africa. In July, 2013, Plaintiff began working as a Rental Service Agent ("RSA") for Defendant at its Kansas City location. Plaintiff subsequently transferred to Defendant's Denver International Airport ("DIA") location in August 2014. After an incident took place between Plaintiff and one of Defendant's customers on November 6, 2016, Defendant terminated Plaintiff's employment on November 29, 2016. In Plaintiff's termination letter, Defendant indicated that Plaintiff's conduct on November 6, 2016—as well as several other incidents that were not formally documented—constituted a violation of the following work rule: "Being rude, abusive or threatening to customers or co-workers." The rule was included in a document that listed "examples of acts or behaviors so serious that they may justify immediate termination," which Plaintiff signed when he began his employment with Defendant in 2013. (Trial Ex. 13.)

## A. PLAINTIFF'S EMPLOYMENT HISTORY WITH DEFENDANT

Justin Nolan, who is Defendant's City Manager and the individual who ultimately decided to terminate Plaintiff's employment, described Plaintiff as a "light hearted"

---

[1] The following facts are undisputed, either based on the Motion for Summary Judgment filed by the Defendant or as a result of testimony at trial.

employee who performed his job well. (Testimony of J. Nolan.) In fact, Plaintiff was designated as one of Defendant's "Top Performers" on several occasions in 2016. (Trial Ex. 79.) Although Plaintiff's job performance was strong, Plaintiff had difficulty navigating interpersonal dynamics in the workplace. Mr. Nolan testified that management became aware of a feud between Plaintiff and another employee, Kirk Giles. According to Mr. Nolan, the two men disliked one another and they had a history of "going after each other" while they were at work. However, Mr. Nolan sought to reach an amicable resolution to the issue because both employees were high performers and Mr. Nolan considered a situation in which Plaintiff and Mr. Giles could "co-exist" to be the best possible outcome.

Additionally, Mr. Nolan described an incident in which he denied Plaintiff's request to display advertisements for Plaintiff's business venture, which involved images of revealing clothing. Despite the fact that Mr. Nolan expressly denied Plaintiff permission to display the advertisements in the workplace, Plaintiff did so anyway. After Mr. Nolan found and disposed of the advertisements, Plaintiff lost his temper with Mr. Nolan and became "very upset."

Similarly, Evi Pichler, who is an Operations Manager at Defendant's DIA location, indicated that she observed Plaintiff lose his temper at work on various occasions. However, Ms. Pichler was sympathetic to the difficulties of adjusting to a new culture because she, like Plaintiff, is an immigrant. Ms. Pichler explained that, based on their shared experiences, she had a close relationship with Plaintiff, and she gave Plaintiff preferential treatment by allowing him to leave early and work at different departments

to assist his performance numbers. Ms. Pichler also testified about an incident that took place on August 29, 2016, in which she did not initiate formal disciplinary proceedings despite the fact that Plaintiff lost his temper and yelled at her. Instead, Ms. Pichler attempted to counsel Plaintiff by "explain[ing] to him he really has to start toning [his temper] down and just really has to approach customers and fellow employees differently."

## B. NOVEMBER 6, 2016 INCIDENT AND EVENTS LEADING TO TERMINATION

The termination letter that Defendant issued to Plaintiff on November 29, 2016, indicates the following:

> November 6, 2016 for the third time you was [sic] involved in an incident that was very egregious, involving a customer and management. The customer had questions about the rental agreement and wanted an explanation regarding the difference in pricing. You refused to assist the customer and implied to the customer that he was stupid because he signed the contract. You told the customer to 'get the fuck out'. When management attempted to counsel you regarding the conflict you was [sic] rude and inappropriate by yelling at the manager in the presence of other employees. This is not your first verbal altercation with management and/or a customer that resulted in a needed [sic] for management to address your inappropriate and unprofessional behavior.

(Trial Ex. 57.) Mr. Nolan testified that Defendant's termination—and the corresponding letter notifying Plaintiff of Defendant's decision—was initiated by Mr. Nolan after he received reports from employees who had witnessed the November 6 incident and managers who interviewed Plaintiff on November 7, 2016. Mr. Nolan indicated that he considered Plaintiff's use of profanity with a customer to be especially egregious, and he was also concerned about Plaintiff's inappropriate demeanor while Plaintiff was communicating with a manager, Evi Pichler, immediately after the incident. Therefore,

Mr. Nolan sent documentation of the event, including witness statements, to Defendant's Human Resources Department ("HR") along with his recommendation that Plaintiff's employment should be terminated. The HR department subsequently investigated the November 6 incident and eventually issued the November 29 termination letter, which Mr. Nolan signed. Mr. Nolan testified that Plaintiff's race and national origin did not factor into his decision to terminate Plaintiff's employment.

In his testimony, Plaintiff did not deny that he was involved in a dispute with a customer on November 6, 2016. Additionally, Plaintiff did not dispute that he had a disagreement with Ms. Pichler immediately afterwards. However, Plaintiff denied that the events took place as they were described in his termination letter. Plaintiff expressly denied that he used profanity while he was talking with the customer. Rather, Plaintiff claimed that it was actually the customer who used profanity.

Additionally, Plaintiff denied that he yelled at Ms. Pichler. Instead, Plaintiff indicated that he speaks loudly as a matter of course. Plaintiff also stated that he was not treated fairly in the November 7, 2016 meeting with management regarding the events of the prior day. Finally, Plaintiff testified that, even if he had engaged in the conduct of which he was accused, he should not have been terminated because a white employee had engaged in similar conduct without being terminated.

Defendant submitted evidence that either explicitly or implicitly contradicted Plaintiff's testimony regarding (1) the dispute between Plaintiff and the customer; (2) the subsequent incident between Plaintiff and Ms. Pichler; (3) Plaintiff's November 7, 2016 meeting with management; and (4) former employees who engaged in similar conduct.

1.      <u>Dispute Between Plaintiff and a Customer on November 6, 2016</u>

Plaintiff testified that the customer he was helping was upset about the amount of his bill. Specifically, the customer took issue with Defendant's billing policies which resulted in a charge that was higher than what he had anticipated. Plaintiff tried to explain that he was just following company policy. However, the customer lost his temper and insulted Plaintiff. At that point, Plaintiff told the customer that the customer needed to leave. Additionally, Plaintiff testified that he never used profanity during his interaction with the customer.

However, Binyam Hailu, who is another African American RSA employed by Defendant and was working less than five feet away from Plaintiff, testified that, as Plaintiff was speaking with the customer about his bill, Plaintiff was responding to the customer's questions in a rude manner, which "started to agitate the customer . . . ." According to Mr. Hailu, the matter escalated until Plaintiff and the customer cursed at one another and the customer left. Mr. Hailu specifically testified that Plaintiff yelled at and told the customer, "you are the dumbass who signed the contract" and to "get the fuck out." Immediately after the incident ended, Mr. Hailu asked Plaintiff why he used profanity with the customer, and Plaintiff responded by saying, "he cursed at me so I cursed at him." Mr. Hailu submitted a statement to Defendant summarizing his observations several days later. Mr. Hailu was unequivocal in his assessment that Plaintiff was being rude to the customer involved. On cross examination, Mr. Hailu stated, "I was so surprised that you [Plaintiff] were talking to the customer like that . . . it is common that customers get upset and it is usually our job to deescalate the situation

so I was surprised that you were talking to him like that." Mr. Hailu testified that he clearly remembered the details of the incident because Plaintiff's manner of speaking and choice of words were so striking.

The Court finds that Mr. Hailu's testimony and recollection of the events were more credible than Plaintiff's testimony.

2.      Disagreement Between Plaintiff and Ms. Pichler on November 6, 2016

After the incident between Plaintiff and the customer ended and the customer had left, Plaintiff testified that he that he went to find Ms. Pichler to explain what had happened. According to Plaintiff, Ms. Pichler "got mad [and] said she didn't want to hear [Plaintiff] out." Plaintiff "didn't agree with [Ms. Pichler] because the customer was really upset" and he thought that it was not fair that Ms. Pichler took the customer's side. At that point, Plaintiff stated that he returned to the counter at which he had been working because he was frustrated that Ms. Pichler was not treating him fairly. Subsequently, Ms. Pichler approached Plaintiff and told him to go home and that the customer would probably file a complaint.

However, Ms. Pichler testified that she was speaking on the phone with the customer involved in the dispute when Plaintiff entered her office and began yelling at her because he perceived that she was siding with the customer. After she hung up the phone, Ms. Pichler asked Plaintiff to lower his voice and said, "we are in the customer service area [and] you can't talk to me like this . . . you kept yelling at me accusing me [that] I would not allow you to explain your situation when I told you that I would be more

than happy to do so but away from customer service areas and away from fellow employees."

Ms. Pichler explained that she considered Plaintiff's conduct to be inappropriate because Plaintiff "was absolutely out of control the way [he] approached [her] in front of fellow employees and [it was] possible customers on the outside of the building . . . heard it." That evening, Ms. Plichler sent an email to Justin Nolan and Jon Prachyl—another manager—informing them about her encounter with Plaintiff. In her email, Ms. Pichler stated, "I don't ever recall any employee speaking to me in such a disrespectful, demeaning manner thought my entire career with [Defendant]." (Trial Ex. 49.)

Rosalinda Solis, who was formerly employed with Defendant as a Customer Service Representative, was present when Plaintiff and Ms. Pichler had their disagreement, and she observed their interaction from ten feet away. Ms. Solis testified that Plaintiff was very upset, yelling, and being rude to Ms. Pichler. Additionally, Ms. Solis recalled that Ms. Pichler instructed Plaintiff not to speak to her in such a manner. Ms. Solis subsequently provided Defendant with a statement summarizing her observations.

The Court finds that Ms. Pichler and Ms. Solis were both more credible than Plaintiff in describing Plaintiff's manner of interacting with Ms. Pichler. Given the prior relationship between Ms. Pichler and Plaintiff, it is unlikely that Ms. Pichler would have completely refused to listen to Plaintiff's point of view, as Plaintiff suggested in his testimony. It is more likely that Ms. Pichler would have tried to deescalate the situation by suggesting that they speak in private, as Ms. Pichler testified. Moreover, Ms. Pichler

and Ms. Solis, who was standing ten feet away, were consistent in their recollection that Plaintiff yelled at Ms. Pichler and that Ms. Pichler instructed Plaintiff not to speak to her in such a manner.

### 3. Plaintiff's November 7, 2016 Meeting with Management

On November 7, 2016, Plaintiff had a meeting with two managers—Jon Prachyl and Mathew Smith—to discuss the incident with the customer and with Ms. Pichler. Plaintiff testified that he communicated his side of the story, and the managers responded by suggesting that Plaintiff should apologize to Ms. Pichler for his behavior. Plaintiff responded by saying that he did not believe that he did anything wrong, so he would not apologize and the managers were not treating him fairly by asking him to do so. Plaintiff testified that the meeting ended with the managers telling Plaintiff that he was suspended from work and that he should write a statement summarizing his version of the events.

In his testimony, Jon Prachyl stated that he began the meeting by apologizing to Plaintiff because Mr. Prachyl understood that customers could be difficult at times. He then asked Plaintiff to explain what occurred the day before. In response, Plaintiff stated that the customer had used profanity with him and Plaintiff voiced his complaint that "the managers always take the side of the customer." Mr. Prachyl recalls that Plaintiff then became "increasingly agitated" as the conversation progressed, and Mr. Prachyl observed that Plaintiff's "body language . . . was . . . aggressive and unapologetic . . . ." Mr. Prachyl advised Plaintiff that their industry is inherently customer oriented and that moving forward Plaintiff should try "to not escalate the tension at the counter [and] to

work on deescalating it and get a manager involved as soon as possible." Mr. Prachyl testified that Plaintiff acknowledged his advice by nodding. At that point, the meeting turned to Plaintiff's disagreement with Ms. Pichler. Plaintiff initially denied yelling at Ms. Pichler. After Mr. Prachyl confronted Plaintiff with various witness statements that had been collected, all of which described him yelling at Ms. Pichler, Plaintiff explained that the witnesses might have mistaken his naturally loud voice for yelling. Mr. Prachyl described Plaintiff's demeanor as "agitated and unapologetic . . . as to what happened." Rather than instructing Plaintiff to apologize to Ms. Pichler, Mr. Prachyl asked Plaintiff "if he felt like what transpired warranted an apology," and Plaintiff indicated that he did not think it did.

Finally, Mr. Prachyl testified that he sought to "put [Plaintiff] at ease with the situation" by explaining that Defendant "brought in a really good management team to help [the] Denver [location]." Mr. Prachyl testified that Plaintiff "cut me off and interrupted me and said . . . I haven't seen a good manager yet I will call you when I see one." After Plaintiff made that comment, Mr. Prachyl ended the meeting because "at that point I knew there was no remorse as to what happened . . . and [Plaintiff] was not admitting to anything that I had statements on."

Moreover, Mr. Prachyl considered Plaintiff's statement about the lack of quality managers to be insulting, and he and Mr. Smith "were just shocked . . . that [Plaintiff's] demeanor wasn't a little different going into [the] conversation." Mr. Prachyl was especially disappointed that Plaintiff did not take responsibility for any of his actions on November 6. Mr. Prachyl explained that, if Plaintiff had approached the meeting

differently and had taken some responsibility, "that could have potentially changed the course of [the] investigation" because he tried to retain employees who have spent substantial time with the company, if possible. After the meeting, Mr. Prachyl and Mr. Smith both submitted written statements to Defendant summarizing their observations. (Trial Ex. 53, 54.)

The Court finds that Mr. Prachyl was credible with respect to his description of the November 7 meeting. It is evident that, from the managers' perspective, the most poignant events in the meeting were Plaintiff's refusal to take responsibility for any of his actions and his comment that there were no good managers at DIA, which were both inappropriate for the context of a professional meeting between an employee and his superiors. It is reasonable that such conduct would motivate a supervisor to move forward with the termination process. Additionally, it is reasonable for the supervisors who witnessed Plaintiff's conduct at the meeting to believe the allegations that Plaintiff acted rudely the day before with both the customer and Ms. Pichler.

4.    Employees Who Engaged in Similar Conduct

Plaintiff's race discrimination claim is premised on different treatment that a white employee received for violating the same work rule that Plaintiff was accused of violating. Specifically, Plaintiff testified that Todd Miller was only suspended for his violation, whereas Plaintiff was terminated. By contrast, however, Defendant produced evidence that showed that Plaintiff's conduct was distinct from Mr. Miller's and that

another white employee, Orion McHugh, was terminated for violating the same rule as Plaintiff.

### a.    Todd Miller

Todd Miller, a white male who was formerly employed with Defendant, testified that on December 30, 2014, he was issued a letter titled "Final Warning – Work Rules Violation," which indicated:

> On December 11th, 2014, an incident occurred between you and the manager on duty. During the exchange, you used foul language and became visibly upset all while in customer view. Please be advised that your actions are a violation of company work rules, specifically: Being rude, abusive or threatening to customer [sic] or co-workers. Please note that any further infraction of this nature will result in further disciplinary action, up to termination.

(Trial Ex. 78.) Mr. Miller was suspended as a result of his rule violation, but his employment was not terminated. Unlike Plaintiff, however, Mr. Miller was not accused of directly yelling at a customer and his supervisor.

### b.    Orion McHugh

Mr. Nolan testified that Orion McHugh, a white male who was formerly employed with Defendant as an RSA, was terminated from his employment on October 25, 2016. The termination letter that Defendant produced indicates:

> On July 17th, 2016 you were involved in a series of events that the company has determined is [sic] unacceptable behavior. There was an incident at the counter in which you were viewed as unprofessional to a customer by calling the customer a 'tourist'. After the incident took place, you left your work area and did not notify a manager; you left the property and did not clock out for almost one hour and you used profane language while speaking to a manager when he called you to find out where you were.

(Trial Ex. 76.) The letter also indicated that Mr. McHugh violated the following work rules: being rude, abusive or threatening to customers or co-workers; leaving an assigned workstation without a manager's approval; and insubordination.

Mr. Nolan elaborated on the details included in Mr. McHugh's termination letter, stating that Mr. McHugh "told the customer to get out you fucking tourist." Mr. Nolan testified that, as the decisionmaker ultimately responsible for Plaintiff's termination, he considered Plaintiff's conduct to be analogous to Mr. McHugh as opposed to Mr. Miller. Like Mr. McHugh, but unlike Mr. Miller, Plaintiff's statements were directed specifically to the customer involved. Mr. Nolan recognized that Plaintiff's conduct was distinct from Mr. McHugh's in that Plaintiff did not leave the premises without permission. However, Mr. Nolan testified that Mr. McHugh's departure was not central to the decision to terminate his employment and the more serious factor was being rude to a customer.

## II.    DISCUSSION AND CONCLUSIONS OF LAW

For the reasons that follow, the Court concludes that Plaintiff has failed to meet his burden on his Title VII claim against Defendant. Title VII provides that it shall be unlawful for an employer to "discharge any individual . . . because of such individual's race . . . or national origin . . . ." 42 U.S.C. § 2000e-2(a). Where, as here, the plaintiff presents no direct evidence of discriminatory treatment based on his race, courts use the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to determine whether the plaintiff has shown unlawful discrimination. *Khalik v. United Air Lines*, 671 F.3d 1188,

1192 (10th Cir. 2012) (citing *Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002)).

First, the plaintiff must establish a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Second, if the plaintiff succeeds in demonstrating a *prima facie* case, the plaintiff establishes a rebuttable presumption of discrimination, which the employer may rebut by articulating a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. Lastly, if the employer provides such a reason, the presumption of discrimination is eliminated, and the plaintiff must show that it is more likely than not that the employer intentionally discriminated against the plaintiff. *St. Mary's Honor Ctr.*, 509 U.S. at 511–19. A plaintiff may meet its burden by "prov[ing] by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981).

## A.    PRIMA FACIE CASE OF DISCRIMINATION

To establish a prima facie case of discrimination resulting in wrongful discharge, a plaintiff must show that the plaintiff was (1) a member of a protected class; (2) qualified for the position at issue; (3) terminated despite possessing the requisite qualifications; and (4) terminated under circumstances which "give rise to an inference of unlawful discrimination." *Perez v. St John Med. Ctr.*, 409 F. App'x 213, 216 (10th Cir. 2010). The 10th Circuit has held that "the fourth element of a prima facie case [of

discrimination] is a flexible one that can be satisfied differently in varying scenarios."

*Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1166 n.8 (10th Cir. 2007)

(quoting *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005)). One method by which a

plaintiff can meet its burden of showing circumstances which give rise to an inference of

discrimination—and the method by which Plaintiff proceeds—is "to show that the

employer treated similarly situated employees more favorably." *Luster v. Vilsack*, 667

F.3d 1089, 1096 (10th Cir. 2011) (citing *E.E.O.C. v. PVNF, LLC*, 487 F.3d 790, 800–801

(10th Cir. 2007)); *accord Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173–1174 (10th

Cir. 2005) (citing *Jones v. Denver Post Corp.*, 203 F.3d 748, 754 (10th Cir. 2000)).

    Here, Plaintiff has not established a prima facie case. Plaintiff readily establishes

the first three elements. It is undisputed that, as an African American from the Ivory

Coast, Plaintiff is a member of a protected class. Plaintiff's qualification for his former

position is evidenced by his rating as a "Top Performer." (Trial Ex. 79.) Additionally,

Plaintiff's employment was terminated despite his strong performance. (Trial Ex. 57.)

However, Plaintiff did not meet his burden of establishing that his termination occurred

under circumstances giving rise to an inference of discrimination. Plaintiff sought to

raise such an inference by showing that a similarly situated employee, Todd Miller, was

treated more favorably although he violated the same rule that Plaintiff violated, yet Mr.

Miller was only suspended whereas Plaintiff's employment was terminated. However,

Plaintiff and Mr. Miller are not similarly situated.

    Individuals are considered "similarly situated" when they deal with the same

supervisor and are subject to the same standards governing performance, evaluation,

and discipline. *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997). Additionally, individuals must be similarly situated in "all relevant respects," and courts traditionally "compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (citation omitted). Moreover, even employees who are similarly situated must have been disciplined for conduct of "comparable seriousness" in order for their disparate treatment to be relevant. *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

In the instant case, Mr. Miller and Plaintiff were not disciplined for conduct of comparable seriousness. The evidence shows that Mr. Miller made an inappropriate remark while in customer view. (Trial Ex. 78.) However, Mr. Miller's comment was not directed at a customer. (Testimony of T. Miller.) Additionally, Mr. Miller was not accused of yelling at a manager and he was not accused of yelling at a customer. (*Id.*) Plaintiff, by contrast, was accused of directing an inappropriate comment to a customer. (Trial Ex. 57.) Moreover, Plaintiff was accused of yelling at a customer as well as yelling at, and being rude to, a manager. (*Id.*) Thus, Mr. Miller's "misconduct could reasonably be viewed as less serious than the [misconduct] displayed by Plaintiff." *Rivera v. City and Cty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004); *see Jackson v. City and Cty. of Denver*, No. 11-cv-02293-PAB-KLM, 2013 WL 1966902, at *7 (D. Colo. May 13, 2013) (finding incidents differed in severity in part because one employee directed an

inappropriate comment towards a particular person whereas the other employee did not).

Because Plaintiff's conduct could be reasonably viewed as more serious than Mr. Miller's conduct, they are not similarly situated. Accordingly, their disparate treatment does not raise an inference of discrimination. As a result, Plaintiff has not established a prima facie case of race discrimination.

## B.  LEGITIMATE REASON AND PRETEXT ANALYSIS

Assuming, *arguendo*, that Plaintiff could establish a prima facie case of discrimination, his Title VII claim would still fail because Defendant has provided a legitimate, non-discriminatory reason for Plaintiff's termination, and there is insufficient evidence to conclude that Defendant's stated reason was pretext for discrimination. Once a plaintiff establishes a prima facie case of discrimination, the burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action. *Khalik*, 671 F.2d at 1192 (citing *Garrett*, 305 F.3d at 1216). If the defendant does so, the burden then shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext for discrimination. *Id.*

1.  Defendant's Legitimate Reason for Discharge

In order to rebut the presumption of discrimination raised by the plaintiff's prima facie case, a defendant must provide a legitimate, non-discriminatory reason for the plaintiff's termination. A defendant's burden is "exceedingly light." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 899–900 (10th Cir. 2017). Specifically, the defendant's

stated reasons need only be legitimate and non-discriminatory "on their face." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (quoting *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011)).

In the instant case, Defendant has met its burden of providing a facially non-discriminatory justification for Plaintiff's termination. Specifically, Defendant indicated that its decision was based on Plaintiff's inappropriate and unprofessional behavior with a customer and with a manager on November 6, 2016. (Trial Ex. 57.)

2.    Pretext Analysis

Because Defendant has provided a legitimate, non-discriminatory reason for Plaintiff's termination, the presumption of discrimination created by the prima facie case is eliminated, and Plaintiff must show that it is more likely than not that the employer's actions were motivated by discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 511. In order to meet his burden, Plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs*, 450 U.S. at 252–53.

Because a plaintiff utilizing the *McDonnell Douglas* framework normally cannot produce direct evidence of discrimination, a pretext argument provides a method of satisfying a plaintiff's burden by allowing the factfinder "to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). A plaintiff establishes pretext by demonstrating "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence" and hence infer that the employer did not act for the asserted nondiscriminatory reasons. *Id*. (citing *Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997))). The 10th Circuit has held that a plaintiff may establish pretext:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (citations omitted). Courts examine facts related to a plaintiff's pretext argument as the facts would have appeared to the person making the decision rather than the plaintiff's subjective evaluation of the situation. *Robinson v. St. John Med. Ctr., Inc.*, 645 F. App'x 664, 648 (10th Cir. 2016) (quoting *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283–89 (10th Cir. 2013)). Therefore, the relevant inquiry "is not whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Robinson*, 645 F. App'x at 648 (quoting *Lobato*, 733 F.3d at 1283–89)).

In the instant case, Plaintiff testified that—contrary to what is reflected in his termination letter—he did not use profanity with a customer and he did not yell at Ms. Pichler during the incident on November 6, 2016. Additionally, Plaintiff submitted evidence of inconsistencies in Defendant's process of terminating his employment. For instance, through his cross examination of Mr. Nolan, Plaintiff obtained admissions that, contrary to Defendant's business practices, Defendant failed to formally document several of the incidents it described in its termination letter. As such, Plaintiff asserts that his termination was motivated by discrimination. However, Mr. Nolan explained that Plaintiff's termination was based on the November 6, 2016 incident and that the other incidents were included only to demonstrate that Plaintiff's behavior was part of a pattern.

Although Plaintiff's termination letter referenced undocumented incidents of Plaintiff's inappropriate behavior, those events were not material to Defendant's decision to terminate Plaintiff's employment. In fact, Defendant's employment policies indicate that a single instance of being "rude, abusive or threatening to customers or co-workers" is considered to be so serious that it "may justify immediate termination." (Trial Ex. 13.) Additionally, this Court has found that the witness standing nearest to Plaintiff was credible in his recollection of Plaintiff yelling and using profanity with the customer on November 6, 2016. *See supra* Section I(B)(1). Therefore, this Court concludes that the evidence Plaintiff submitted does not render Defendant's non-discriminatory justification "unworthy of credence." *Swackhammer*, 493 F.3d at 1167.

Further, considering the facts from the perspective of the decisionmaker, Mr. Nolan, it is clear that the motivation behind Defendant's decision to terminate Plaintiff's employment was not pretext for discrimination. For instance, when asked whether he considered the incidents in which Plaintiff and Todd Miller were involved to be significantly different, Mr. Nolan responded, "I do view them as being very different . . . Todd was talking to a manager, and while his behavior was completely unacceptable, he never told a customer to get the fuck off the premises, which [Plaintiff] did."

Additionally, Mr. Nolan testified that he based his decision in part on Jon Prachyl's November 7, 2016 meeting with Plaintiff in which Plaintiff failed to take responsibility for any of his actions and behaved unprofessionally during the meeting. In short, Mr. Prachyl's observations corroborated the witness reports that described Plaintiff behaving unprofessionally the day before, and formed a clear and consistent basis for Mr. Nolan's ultimate decision. Regardless of whether Defendant's proffered reasons were "wise, fair, or correct," there was no evidence submitted that would lead to any conclusion but that Mr. Nolan honestly believed the reasons cited for Plaintiff's termination and acted in good faith upon those beliefs. *Robinson*, 645 F. App'x at 648. Therefore, Plaintiff has failed to establish that Defendant's non-discriminatory reason for terminating his employment was actually pretext for discrimination.

### III.    CONCLUSION

Based on the entire record, the Court finds that the evidence fails to prove, by a preponderance, that Defendant AB Car Rental Services, Inc. discriminated against Plaintiff on the basis of race or national origin. Accordingly, The Court issues judgment

in favor of Defendant AB Car Rental Services, Inc. and dismisses this action with prejudice.

The Clerk of the Court respectfully is directed to enter judgment in Defendant's favor and terminate this action. It is

FURTHER ORDERED that Defendant's Motion for Clarification Regarding Post-Trial Submissions (Doc. # 70) is DENIED as moot.


DATED: January 29, 2019                    BY THE COURT:


_____
CHRISTINE M. ARGUELLO
United States District Judge